# UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA
## Fort Lauderdale Division

FILED BY _____ D.C.

SEP 30 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

**ERNEST RASHEEN ADMIRAL,**

Plaintiff,

v.                                              Case No.:_____

**THE EPISCOPAL CHURCH OF SAINT
MARK THE EVANGELIST, INC.,**
d/b/a SAINT MARK'S EPISCOPAL SCHOOL,
**DR. JAMES SPENCER TAINTER,** in his
individual capacity,
**MAGDA LIPSCOMB,** in her individual
capacity,
**HELLEN MARTINEZ,** in her individual
capacity,
**CARLOS NOVOA,** in his individual capacity,

and
**RIGHT2PROTECT, LLC,**
**MIGUEL D PUYADA,** in his individual
capacity,

Defendants.

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, Ernest Rasheen Admiral ("Plaintiff"), brings this action against Defendants The Episcopal Church of Saint Mark the Evangelist, Inc. d/b/a Saint Mark's Episcopal School ("Saint Mark's"), Right2Protect, LLC ("R2P"), and individual defendants Dr. James Spencer Tainter, Magda Lipscomb, Hellen Martinez, Carlos Novoa, and Miguel D. Puyada a/k/a "Mickey" (collectively, "Defendants"), and alleges:

## I. JURISDICTION AND VENUE

1. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; 42 U.S.C. § 1981; the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, et seq.; and related Florida state law claims.

2. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question), and supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

3. This Court also has jurisdiction over Plaintiff's claims arising under the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01, et seq., pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to this action occurred in Broward County, Florida, which lies within the Southern District of Florida.

## II. PARTIES

5. Plaintiff resides in Broward County, Florida, where the events giving rise to this action occurred.

6. Defendant The Episcopal Church of Saint Mark the Evangelist, Inc. d/b/a Saint Mark's Episcopal School ("Saint Mark's") is a Florida non-profit corporation operating a private school and church at 1750 E Oakland Park Blvd, Fort Lauderdale, FL 33334.

7. Defendant R2P is a Florida limited liability company with its principal place of business at 4302 Hollywood Blvd., Ste 93, Hollywood, FL 33021, owned by Defendant Miguel D Puyada a/k/a "Mickey".

8. Defendant Dr. James Spencer Tainter was Head of School at Saint Mark's during the events described herein. Despite the school's later legal claim that it had "no control" over Right2Protect (R2P) personnel decisions, Dr. Tainter personally ordered the termination of Plaintiff by stating directly to Miguel Puyada, owner of R2P, that if he did not fire Plaintiff, R2P would not be considered for the new security contract at the school. This coercive threat, which led to Plaintiff's termination on the same day, directly contradicts the school's legal denials of involvement. Accordingly, Dr. Tainter is not only a supervisor and agent of the school but a central actor in the retaliatory termination, making Saint Mark's vicariously and directly liable for the unlawful employment actions

taken against Plaintiff.

9. Defendant Magda Lipscomb was a staff administrator at Saint Mark's during the events described herein.

10. Defendant Hellen Martinez was a staff administrator at Saint Mark's during the events described herein.

11. Defendant Carlos Novoa was an employee at Saint Mark's during the events described herein.

12. Defendant Miguel D. Puyada, owner of Right2Protect (R2P), served solely as a payment intermediary for Plaintiff's services, while Saint Mark's Episcopal School exercised full control over Plaintiff's schedule, assignments, uniforms, duties, and conditions of employment. Puyada did not direct Plaintiff's work and had no supervisory or managerial input beyond processing payments. Despite this, Puyada personally executed Plaintiff's termination at the demand of Dr. Spencer Tainter, who informed him that R2P would not be considered for contract renewal unless Plaintiff was removed. Puyada complied without any independent investigation, thereby participating in a retaliatory scheme and confirming a coordinated effort to silence and punish Plaintiff for protected activity. This makes both R2P and Saint Mark's jointly liable as de facto employers and retaliators under federal and state law.

13. At all relevant times, Plaintiff was jointly employed, supervised, and controlled by Saint Mark's and R2P.

14. Plaintiff brings this action individually and on behalf of all other similarly situated employees under 29 U.S.C. § 216(b), who were subject to the same unlawful pay practices described herein.

## III. FACTUAL ALLEGATIONS

### A. Employment and Misclassification

15. Plaintiff was employed as a contracted security officer through Right2Protect, LLC ("R2P"), but was misclassified as a 1099 independent contractor despite being treated as a de facto employee of Saint Mark's Episcopal School. Plaintiff worked over 55 hours per week, including 11 to 16 hour shifts in extreme weather, often without formal meal breaks or rest periods. When Plaintiff raised concerns about the lack of breaks, supervisors responded with dismissive messages such as, "We don't get breaks," and

"We're always on duty," while also admitting that the situation needed improvement. Plaintiff's work schedule, attire, and job responsibilities were dictated by Saint Mark's, not R2P. For example, when Plaintiff requested permission to wear tactical shorts due to heat, approval had to be sought from Saint Mark's administrators, further demonstrating lack of independence or control typically afforded to a true contractor. These facts support that Plaintiff functioned as an employee rather than an independent contractor. (See Exhibit X)

16. Plaintiff's compensation was deposited directly by Defendant R2P as "Payroll (PPD)" transactions using the Automated Clearing House (ACH) system. Although deposits were made into Plaintiff's business account, the payment coding clearly indicated that R2P treated Plaintiff as a payroll employee in practice.

17. Plaintiff possesses over two years of bank statements showing consistent ACH deposits from R2P coded as "Payroll (PPD)," confirming wage payments that aligned with employee treatment. Despite this, Plaintiff was denied the legal benefits and protections owed to employees, including overtime pay and workers' compensation coverage. (See Exhibit E)

18. Defendants engaged in a systematic scheme to avoid paying lawful overtime by artificially separating hours worked into distinct categories—such as school security, church, aftercare, summer camp and special events—even though all work occurred on the same campus under the same supervision. Plaintiff routinely worked well over 40 hours per week but was paid straight-time wages outside of school hours if it was not for the "School", in violation of the Fair Labor Standards Act (FLSA).

19. Defendants required Plaintiff and other officers to submit separate timesheets for different work categories, despite these assignments all being part of one integrated job function performed at the same location. This was a deliberate strategy to circumvent wage laws and obscure total hours worked.

20. When Plaintiff questioned why he was not receiving overtime compensation, Defendant Miguel "Mickey" Puyada, owner of R2P, admitted that this practice was at the direction of Saint Mark's. He stated to Plaintiff: "This is what the client wants," acknowledging that wage structuring was dictated by Saint Mark's administration.

**B. Campus Safety and Misconduct**

21. Multiple serious breaches of campus security occurred due to broken gates, lack of surveillance cameras, and poor enforcement protocols. Plaintiff personally observed at least three unauthorized individuals enter the Lower School building, make it past the Parish Hall courtyard (which has no surveillance), and walk directly into the main office — in some cases soliciting or asking for individuals. One of these areas is adjacent to Rev. Grant's office, which houses the youngest children on campus. These intrusions were especially dangerous, as individuals could blend in before staff even noticed. Plaintiff warned administrators about these vulnerabilities as early as his first days on duty, but the concerns were ignored. Church members and others visiting church office were regularly present in areas with no cameras, creating blind spots across the campus. Plaintiff initially wore a body camera for accountability, but was later ordered to remove it, leaving him unprotected in unsafe conditions. Had any of the intruders intended harm, tragedy could have occurred due to Saint Mark's failure to act.

22. Between 2023 and 2024, teacher Michael Morrill, who publicly identified as HIV-positive and described himself as "Mr. Hong Kong" and a former gay porn actor, discussed HIV, PrEP, and his sexual history with minor students at Saint Mark's. Several students reported feeling uncomfortable and pressured, leading both students and Plaintiff to report the behavior to staff. Despite these warnings, Saint Mark's and Right2Protect took no action, conducted no investigation, and instructed staff not to engage with Plaintiff. Morrill quietly departed in May 2024 after his contract was not renewed, without explanation. The school knowingly hired Morrill and failed to act even after student complaints, reinforcing a pattern of forced normalization, retaliation, and institutional silence around protected reports.

23. Between January and April 2025, Plaintiff reported a substitute teacher who appeared visibly intoxicated on campus—initially striking a vehicle with his truck and later, after lunch, colliding with another vehicle while riding an electric scooter. Plaintiff's first report was dismissed by school administrators, who responded that "he is okay" and "not drunk." After leaving campus temporarily, the substitute returned and struck additional vehicles, prompting a second report by Plaintiff. Only then was the individual barred from campus. Despite these alarming incidents and the clear safety risks posed around children, the substitute was later observed returning to campus during a Pride event, assisted by the school's priest in loading a vehicle. This sequence demonstrates a reckless disregard for student safety, repeated administrative inaction, and failure to enforce even

basic safety and sobriety standards.

24. Throughout his tenure, Plaintiff was repeatedly pressured by school administrators and by Mickey Puyada of Right2Protect, LLC to pose for promotional photographs for Saint Mark's website and marketing materials. Plaintiff consistently refused and verbally told Mickey multiple times, "We don't want our pictures on their website," objecting to both the request and the environment in which it was made. Despite these clear refusals, school administrators and R2P continued to pressure staff, dismissing objections with statements such as, "We don't see what the big deal is." Other officers who had posed for pictures before Plaintiff reported that they felt coerced into doing so. Given Plaintiff's knowledge of misconduct within the school, and his concerns about being publicly associated with it, he adamantly declined to allow his image to be used. These repeated requests were not only invasive but created a retaliatory and coercive environment for Plaintiff. Additionally, as Florida is a two-party consent state, any unauthorized use of an individual's image or voice without consent may constitute a violation of state privacy laws, further underscoring the school and R2P's disregard for personal and legal boundaries.

25. In late May 2024, Head of School Dr. Spencer Tainter publicly claimed that the removal of a long-serving security officer, "Manny," was due to a "normal rotational change" (See Exhibit F). This statement was knowingly false. Plaintiff has personal knowledge that Dr. Tainter himself directly ordered Manny's termination, not Right2Protect (R2P), exposing a contradiction in St. Mark's later legal claims that it had no control over R2P personnel decisions. This contradiction is further evident in Plaintiff's own termination, which occurred only after Dr. Tainter privately told R2P's owner that he needed Plaintiff removed to be considered for contract renewal. These facts undermine St. Mark's legal position demonstrates that the school has been actively involved in directing security staffing—firing some guards directly while disavowing responsibility when lawsuits or complaints arise.

26. In June 2024, and again in June 2025, Saint Mark's Episcopal School publicly promoted its participation in the City of Oakland Park's Pride Celebration, despite having ignored Plaintiff's repeated reports of workplace harassment, retaliation, and serious safety violations. As part of the event, attendees were issued name tags created by Right2Protect security manager and then by the church itself once this same officer was terminated. Will over 50 name tags were printed for individuals who were neither affiliated with the school nor the church. These tags were identical in appearance and format to the official staff identification badges used to pass security checkpoints and access restricted areas. The indiscriminate distribution of these name tags resulted in multiple security breaches and

undermined established safety protocols on school grounds. (See Exhibit G).

27. Plaintiff repeatedly reported serious safety violations involving a known registered sex offender entering Saint Mark's Episcopal School grounds. This individual had already accessed the campus twice prior without proper clearance, and despite being flagged in the school's SchoolPass security system, administrative staff — including Hellen Martinez — instructed security to "just watch him like a hawk" and allow entry for construction purposes. Plaintiff refused to admit the individual and voiced his concerns to R2P onsite manager Israel Mendez, to R2P owner Miguel "Mickey" Puyada, and directly to Dr. James Spencer Tainter. Mickey dismissed Plaintiff's objections, stating, "You have to do what the client wants." Israel ultimately overrode Plaintiff and white-listed the sex offender in the system, effectively removing red-flag alerts on March 13, 2025 when the individual attempted access again. Plaintiff refused and escalated the matter, forcing Dr. Tainter to meet with both Plaintiff and Israel. Tainter initially questioned the security system's reliability, asking how they knew the individual was on the registry. Plaintiff explained the SchoolPass system identifies sex offenders through ID scanning and expressed that such entry poses an unacceptable risk to staff and children. When confronted with this logic, Tainter responded, "Don't talk like that," but finally agreed to bar entry — only after pressure and exposure. These events are documented in Plaintiff's messages with the construction general contractor (See Exhibit H), clearly showing Plaintiff's repeated efforts to block entry, the unsafe override by school and contractor staff, and the systemic failure to uphold basic student safety protocols.

28. On March 4, 2025, a construction worker employed on the school's Science building project entered campus grounds in the presence of children while openly carrying a knife. The worker then approached Plaintiff from behind in a threatening manner with the knife in hand. A maintenance employee "Emilio Sepulveda Sexton", observing the danger, shouted a warning to Plaintiff: "Watch out, he has a knife." The worker subsequently retreated but remained on campus. The plaintiff immediately reported the incident to school officials. Despite this report and the clear safety violation, Defendants permitted the worker to remain on the project and complete his assignment. Defendants' failure to remove or discipline the worker placed children and staff at ongoing risk, reflected a reckless disregard for safety, and violated established school policies prohibiting weapons on school property. (See Exhibit DD)

29. In January 2025, Plaintiff discovered blood splattered throughout a bathroom on the church property. Plaintiff heard distressed noises from the area and witnessed two adult males exiting the bathroom—one visibly in pain, with blood on the rear of his shorts. Plaintiff immediately reported the incident to both the school's business office and to Right2Protect, LLC. No investigation was conducted. Instead, custodial staff were

directed to clean the scene without further inquiry or reporting to law enforcement and demonstrating a willful failure to protect students and staff from potential criminal activity. This response was consistent with prior patterns of ignoring dangerous or illegal conduct on campus.

30. In March 2025, Plaintiff was sexually harassed by a church member who groped him, asked for his phone number, and made comments about Plaintiff's body. Later that same day, the same individual stood directly in front of Plaintiff and engaged in a loud conversation with another man about having sex with his partner. Plaintiff immediately informed Defendant Miguel "Mickey" Puyada that he was uncomfortable, that he intended to reposition himself to avoid being touched or subjected to further harassment, and that corrective action was needed. Instead of addressing the harassment, Defendants R2P and Puyada minimized Plaintiff's complaint. The following day, the Rector lodged a complaint against Plaintiff, claiming church members objected to him sitting in the golf cart rather than standing at the door an act Plaintiff reasonably perceived as retaliation for his protected complaint. Plaintiff told Puyada he never wanted to work church duty again, and no remedial measures were taken. The following week, Puyada himself admitted to Plaintiff that he, too, had been touched in an unwanted and inappropriate manner by a church member, confirming the seriousness of the misconduct that Defendants failed to address.


**C. Sexual Harassment and Hostile Work Environment**

31. From approximately March 2024 through August 2025, Plaintiff was subjected to persistent and unwelcome sexual harassment by Defendant Carlos Novoa, creating a hostile and degrading work environment. Defendant Novoa engaged in a pattern of daily misconduct that included rubbing Plaintiff's lower back and neck under false pretenses (e.g., pretending to move through crowded areas), brushing against Plaintiff unnecessarily, and initiating inappropriate handshakes—such as rubbing his finger across the center of Plaintiff's palm in a sexually suggestive manner. He frequently grabbed and squeezed Plaintiff's shoulders and made objectifying comments such as, "You're big—I didn't realize how big you were." Defendant Novoa also made personal inquiries including, "Are you single?" and "What are you doing this weekend?"—further contributing to Plaintiff's discomfort. On multiple occasions, Novoa would approach Plaintiff under false pretenses—asking questions like "Is the front gate open?" or "Where's Israel?" and "Can i park over here?"—despite knowing the answers or having direct access to that information. These tactics were used to initiate unwanted interaction. Plaintiff often avoided him by driving off, hiding, or going out of sight; however, at times, Plaintiff was cornered and unable to disengage. The conduct was uninvited,

occurred regularly in the workplace, and contributed to a sustained environment of fear, humiliation, and emotional distress. This conduct was reported to Saint Marks and Right 2 Protest and nothing was done about it on several occasions. This pattern of ignoring credible reports of misconduct illustrates Saint Mark's and R2P ongoing failure to take reasonable action to protect students, employees, and visitors.

32. Complaints to Defendant Lipscomb were dismissed with a remark that it was "he probably likes your [Plaintiff's] masculine energy" and laughed.

33. Complaints to Defendant Martinez resulted in promises of memos, training, and discipline, none of which were carried out. No investigation occurred.

34. Beginning June 28, 2024, Plaintiff deliberately avoided contact with Novoa and other staff. Despite this, Novoa repeatedly forced unwanted conversations. When others asked why, Plaintiff replied: "I just want to do my job and go home."

35. On July 31, 2025, Plaintiff informed administrator Ginny that the workplace had become "pretty uncomfortable" and asked not to be recognized for his birthday. Ginny replied: "I'm sorry things are uncomfortable for you. You shouldn't have to feel that way." (Exhibit I).

36. Later that same day, Plaintiff told Ginny that Defendant Tainter directed Defendant Puyada to fire him without cause. Ginny responded with sympathy, confirming awareness of Plaintiff's protected complaints and the retaliatory nature of his termination (Exhibit J).

37. Throughout 2024–2025, Plaintiff made repeated reports to his supervisor Israel (R2P) and to Defendant Puyada. Responses consistently included: "We'll look into it," "We'll take care of it," silence, or Puyada's statement: "I have to satisfy the customer."

38. Defendant Puyada repeatedly enforced Saint Mark's directives, telling Plaintiff: "This is what the client wants." Right2Protect never acted independently to protect Plaintiff, instead deferring entirely to Saint Mark's even when unlawful.

39. On June 26, 2024, after Plaintiff raised concerns about harassment and retaliation, Defendant Miguel "Mickey" Puyada stated: "I wish I could make this go away but this is very sad. I have to keep the client happy and it often puts me up against a wall. I don't want to lose you but moving on may be the best for you. I will provide a recommendation letter if needed and wish I had another post available for you. I appreciate you hanging on until you secure another position just please keep me posted so I can make sure there is

coverage." This statement, framed as advice to leave his position, reflects retaliation for Plaintiff's protected complaints and constitutes pressure to resign, evidencing constructive discharge. ( Exhibit k)

40. Defendants applied the same "separate timesheet, no overtime" policy to other Right2Protect officers and Saint Mark's workers. Employees who worked aftercare, church events, athletic games, or security details were all required to submit separate time records and were paid straight time only, regardless of total hours worked.

41. Defendant The Episcopal Church of Saint Mark the Evangelist, Inc., is registered as a Florida Not for Profit Corporation (Exhibit L), yet has engaged in conduct inconsistent with that status. While publicly operating as a religious nonprofit, Defendant retained state education funds tied to falsified student attendance records, withheld payments owed to vendors and staff as a form of control, and used financial coercion to silence whistleblowers. From approximately June 9, 2025, through August 1, 2025, Saint Mark's Episcopal School withheld contractual payments to its security vendor, Right2Protect, in direct retaliation for Plaintiff's protected disclosures about harassment, unsafe conditions, and misconduct. As a result, Plaintiff was forced to work full shifts without regular compensation. During this time, Right2Protect's owner resorted to irregular Zelle payments to Plaintiff outside of formal payroll, stating this was "damage control" (Exhibit E p.2). In reality, Saint Mark's used delayed vendor payments as leverage, coercing Right2Protect into assigning its owner to monitor Plaintiff during shifts and ultimately terminate him in order to secure a renewed security contract. These actions were not isolated or administrative oversights. Rather, they represent a deliberate scheme of economic intimidation, coercive employment practices, and misuse of nonprofit resources. Such conduct supports Plaintiff's claims of retaliation, constructive discharge, whistleblower suppression, and nonprofit abuse.

**D. Retaliation and Confidentiality Threats**

42. On or about February 3, 2025, well over one year after Plaintiff began working at Saint Mark's Episcopal School, Plaintiff was abruptly forced to sign a non-disclosure agreement (NDA) under threat of termination. This demand came immediately after Plaintiff reported multiple concerns, including sexual harassment, explicit magazines left in common areas, and the presence of unsafe and unvetted contractors around children. The timing and context of the NDA strongly indicate it was retaliatory and executed under duress. Unlike a standard onboarding document, this NDA was not presented at the start of Plaintiff's employment, but rather only after Plaintiff began voicing serious

concerns that were becoming known to parents, staff, and members of the public. The NDA was issued as part of a broader effort by school leadership to silence internal whistleblowers and protect the institution's reputation. Plaintiff was informed by the owner of Right2Protect, under direction from the school, that failure to sign and return the NDA by the next business day would result in immediate removal from the job site and loss of his position. This ultimatum, combined with the school's retaliatory culture, rendered Plaintiff's consent involuntary and the agreement voidable under the doctrine of contract signed under threat, duress, and coercion (TDC) (Exhibit M).

43. On August 4, 2025, after Plaintiff's termination, Defendant R2P texted Plaintiff to "cease direct communication with individuals at Saint Mark's" and asserted that all matters "fall back on Right2Protect" (Exhibit N).

44. Plaintiff replied that he had no contact with staff and reminded Defendants that any confidentiality agreement "does not supersede state and federal law."

## E. Protected Disclosure and Retaliatory Suppression

45. In March 2024, Plaintiff first reported to Defendant Miguel "Mickey" Puyada, owner of Right2Protect, LLC, that inappropriate adult-themed magazines were being delivered to Saint Mark's Episcopal School. The matter involved publications that had reportedly been received and openly accessible for years. On July 19, 2024, the magazines were delivered again, prompting Plaintiff to raise the issue a second time—this time reporting directly to both Mr. Puyada and staff member Ginny. Plaintiff reiterated that the continued delivery of such materials to a school campus posed a serious safety and ethical concern. Then, on June 16, 2025, at the request of Mr. Puyada, Plaintiff re-submitted this information along with new evidence about teacher Morrill and a remaining explicit video still accessible online. Plaintiff noted the content had been partially scrubbed, suggesting a deliberate attempt to conceal it. Mr. Puyada responded, "Copy thanks we will keep this in our pocket in case we need it." Despite the repeated disclosures, no corrective action was taken, and retaliation escalated. (See Exhibit Z)

46. The fact that Defendant Puyada requested the same material again, despite Plaintiff's prior report, underscores that no meaningful investigation or documentation ever occurred. Instead, Defendants opted to keep the information concealed or "in their back pocket," not to address misconduct but to protect the school and themselves. This re-request was not made in good faith but appears retaliatory, meant to downplay the earlier disclosure and silence further protected activity. Rather than act on Plaintiff's disclosures or implement corrective measures, Defendants escalated retaliation, including attempts to isolate Plaintiff, subject him to coercive conditions, and remove him from his

post. This conduct directly supports Plaintiff's claims under Title VII and the Florida Civil Rights Act for retaliation, hostile work environment, and constructive discharge.

**F. Systemic Retaliation and Termination**

47. On June 9, 2025, former Saint Mark's parent Mr. Muñoz — who had previously been expelled following a confrontation with Head of School Dr. James Spencer Tainter over alleged misconduct, including controversial publications the school had subscribed to and been featured in for years (see Exhibit Y) — publicly released a podcast and a related video series exposing harassment, retaliation, and corruption within the school's leadership. In response, Dr. Tainter circulated a mass email to the Saint Mark's community attempting to discredit the allegations and control the narrative. (See Exhibit P.)

48. On June 12, 2025, Defendants, through their newly retained law firm Tripp Scott, P.A., issued a Cease-and-Desist Letter to Mr. Muñoz, a former Saint Mark's parent. The letter threatened legal action and demanded the removal of Mr. Muñoz's podcast, which publicly exposed harassment, retaliation, and institutional misconduct at Saint Mark's Episcopal School. The letter specifically referenced allegations that mirrored Plaintiff's own protected complaints—including harassment, corruption, and unsafe conditions—yet the school never addressed or investigated these concerns. Notably, the podcast also included comments about the Plaintiff, which neither Saint Mark's nor Right2Protect, LLC ever confirmed, denied, or responded to. Instead, the matter was ignored entirely, despite internal awareness. Later, Right2Protect dismissed the statements as merely a "fervious" comment and claimed the matter was "handled," though no formal clarification, denial, or protection of Plaintiff's reputation was ever issued. (See Exhibit Q)

49. Defendants' rapid threats against a parent, while ignoring Plaintiff's repeated complaints, demonstrate a systemic policy of retaliation and concealment rather than remediation.

50. Following the release of Mr. Muñoz's podcast exposing harassment, retaliation, and institutional misconduct at Saint Mark's, the school circulated false rumors that it would incite a riot and told staff and families that the allegations were all lies. In reality, numerous staff and families shared similar experiences but were silenced by NDAs, expulsion, or fear of retaliation. The Hennessy family, for example, was expelled along with their children merely for asking questions, as confirmed by the school's own expulsion letter. (See Exhibit AA.) In response to the podcast, Defendant Miguel "Mickey" Puyada was stationed on campus as an "extra officer" under the guise of

"damage control." He worked without pay and was himself receiving delayed compensation, consistent with how Plaintiff was also being treated. Dr. Tainter allegedly instructed Puyada to "cover it without pay if [R2P] wanted a change to keep the contract." Plaintiff, meanwhile, was marginalized, monitored, and subjected to withheld wages. Notably, Plaintiff was discussed in the podcast, yet neither Saint Mark's nor Right2Protect ever acknowledged, investigated, or even denied the serious allegations made about him. Instead, they dismissed the podcast as "fervius" (presumably frivolous) and falsely claimed "everything was handled." This reflects a broader pattern of suppression, retaliation, and institutional gaslighting by both Defendants. (See Exhibits P, Q, AA).

51. On August 1, 2025, Defendant Tainter told Defendant Puyada that renewal of the R2P contract required Plaintiff's termination.

52. That same day, Defendant Puyada called Plaintiff and admitted: "If I don't let you go, I won't get my contract."

53. Plaintiff was terminated on August 1, 2025, in direct retaliation for engaging in protected activity and reporting harassment, unsafe conditions, and institutional misconduct. Later that same afternoon, Plaintiff called Miguel "Mickey" Puyada, owner of Right2Protect, to ask why he was being fired. Mr. Puyada candidly admitted, "They want you gone — I won't get the contract if you're with me." When Plaintiff asked who "they" were, Mr. Puyada identified Dr. Spencer Tainter. Plaintiff pressed further and asked for a reason, to which Puyada responded, "I can't give you a reason, but I have to do what the client wants." Mr. Puyada did not offer to relocate Plaintiff to another client site, despite having authority to do so, and instead carried out Saint Mark's demand to terminate him. This exchange not only demonstrates retaliatory intent but also underscores Plaintiff's misclassification: Plaintiff was under the direct control of Saint Mark's and removed at their discretion, revealing that Right2Protect functioned as a nominal intermediary while Saint Mark's exercised the authority of a direct employer.

54. On or around August 6, 2025, Saint Mark's awarded Defendant R2P the renewed contract for campus security.

55. These facts establish a coordinated conspiracy between Saint Mark's and R2P to retaliate against Plaintiff, silence whistleblowers, and preserve their financial arrangement at the expense of Plaintiff's rights.

**ADDITIONAL FACTUAL ALLEGATIONS**

**G. Privileged Settlement Offer Demonstrates Continuing Retaliation and Bad Faith**

56. Plaintiff was never asked to sign a non-disclosure agreement (NDA) until after he began reporting sexual harassment, unsafe working conditions, and serious misconduct to both Right2Protect, LLC (R2P) and Saint Mark's Episcopal School. After these reports, Plaintiff was treated as a threat rather than a protected employee and was quickly silenced through retaliatory measures, including warnings not to speak to parents or staff about any internal matters.

57. In early February 2025, Plaintiff was coerced into signing an NDA under threat of termination by Defendant Miguel "Mickey" Puyada, acting at the request of Saint Mark's. Plaintiff was told, "If you don't sign this, you won't have a job," and was explicitly instructed not to discuss anything related to his experiences at Saint Mark's — including matters affecting safety, legal compliance, and employee rights — with anyone outside of R2P or the school itself. The NDA was used not for legitimate business confidentiality, but as a tool to suppress reporting of illegal and unethical conduct.

58. On September 2, 2025, after Plaintiff had already received his EEOC Notice of Right to Sue, Defendant Puyada's attorney, James F. Sposato, sent Plaintiff a so-called "settlement offer" of $3,840 — purportedly to cover four weeks of pay — in exchange for a full release, retraction of claims, mutual non-disparagement, and signing of yet another confidentiality agreement. (See Exhibits R)

59. On September 11, 2025, Plaintiff received a second and slightly higher offer of $4,750, again requiring a non-disclosure agreement (NDA), full legal release, and agreement not to pursue any additional claims. Like the prior offer, this proposal was sent by attorney James F. Sposato of Chusid, Katz, & Sposato, LLP, and presented under the label of a "privileged settlement communication." These successive offers were not genuine efforts to resolve legitimate disputes, but rather coercive tactics designed to suppress Plaintiff's protected rights and silence ongoing complaints. Both offers were issued after Plaintiff had already initiated administrative action and were clearly intended to block further legal proceedings.

60. This offer was labeled as a "privileged settlement communication" under Fla. Stat. § 90.408 and presented Plaintiff with hush money in return for his silence — despite Plaintiff having detailed, corroborated claims of ongoing sexual harassment, retaliation, unsafe work conditions, misclassification, and criminal misconduct involving children.

61. The offer is not only insultingly low, but constitutes further retaliation and intimidation, reinforcing the systemic pattern of silencing anyone who reports wrongdoing. Rather than addressing the violations, Defendants sought to bury the truth through a second NDA attempt under the guise of "settlement." (See exhibit S)

**R2P's Independent Regulatory Failures and Abuse of Licensing Authority**

62. Defendant Miguel "Mickey" Puyada holds multiple professional licenses (See Exhibit T) under Florida law, including:

   • Class "CC" Private Investigator Intern License

   • Class "G" Statewide Firearm License

   • Class "D" Security Officer License

   • Class "M" Security Manager License

   • Class "C" Private Investigator License

   • Class "MA" Agency Manager License

   • Class "B" Security Agency License

63. Despite repeated assurances from Defendant Miguel "Mickey" Puyada that Right2Protect, LLC ("R2P") treated Plaintiff "like family," the company's actions told a different story. On August 1, 2025, at the direction of the Head of School, Dr. Spencer Tainter of Saint Mark's Episcopal School, Defendant Puyada terminated Plaintiff without offering any reassignment or continued employment opportunities. (See Exhibit U)

64. In prior text messages and verbal conversations, Defendant Puyada admitted that his priority was to "satisfy the customer" and "do what the customer wants," even if it meant disregarding Plaintiff's rights and protected activity. These statements demonstrate that

Plaintiff's termination was not based on performance or legitimate business reasons, but solely to preserve R2P's contract with Saint Mark's and to silence Plaintiff's reports of harassment, discrimination, unsafe conditions, and fraud. (See Exhibit K p.2)

65. Following Plaintiff's termination, counsel for R2P, James Sposato, sent Plaintiff a series of emails dated September 2–3, 2025. In these emails, counsel threatened Plaintiff with potential reporting to the Florida Department of Agriculture and Consumer Services and disparaged Plaintiff's attempts to seek legal relief, calling his actions "reprehensible." These communications constitute further evidence of retaliation, coercion, and bad faith by Defendants. (See Exhibit R)

66. As a licensed security professional and agency owner, Defendant Puyada had an affirmative duty under Florida law and administrative rules to independently investigate harassment, unsafe conditions, and retaliation. Instead, he deliberately ignored complaints to preserve his financial interest in the school's contract. At no time did Puyada act to protect Plaintiff or intervene against Saint Mark's retaliation — even when safety was at risk and illegal conduct was reported.

67. These facts establish that R2P and Defendant Puyada not only failed to meet professional and ethical standards, but actively participated in a coordinated effort to silence, punish, and ultimately terminate Plaintiff for doing his job and reporting what he experienced and observed.

68. Defendant Puyada's misconduct as a license holder was not passive. He knowingly prioritized securing and retaining Saint Mark's as a client over fulfilling his regulatory and ethical responsibilities as a security agency operator, firearms licensee, and private investigator.

**H. NDA Coerced Under Threat of Termination**

68. On or about February 3, 2025, Defendant Puyada presented Plaintiff with a non-disclosure agreement (NDA), stating it was "required by the client," and explicitly warned Plaintiff that refusal to sign it would result in immediate termination. Plaintiff was told the NDA must be signed and returned by the next business day or he would not be allowed to return to work at Saint Mark's. (See exhibit M)

69. At that point, Plaintiff had already worked at Saint Mark's for over a year without being asked to sign an NDA. The timing — immediately after Plaintiff began reporting misconduct, including sexual harassment, explicit materials on campus, and unsafe

contractors — demonstrates that the NDA was a retaliatory tool aimed at silencing protected activity. It was not a standard onboarding requirement but rather a coerced agreement designed to prevent further disclosures to parents, the public, or authorities.

70. Plaintiff signed the NDA under duress, coercion, and threat of termination. Defendant Puyada made clear that Plaintiff's continued employment was contingent on his silence regarding the school's ongoing misconduct.

71. The NDA sought to retroactively cover up complaints already made by Plaintiff and insulate Defendants from future liability. The agreement aimed to suppress reports about sexually explicit magazines found on campus, threatening and unvetted contractors, retaliatory staff behavior, and widespread safety concerns — all of which had become known within the school community.

72. The pattern of coercion continued well beyond February. On September 2, 2025, counsel for Right2Protect issued a second settlement proposal offering $3,840 in exchange for Plaintiff signing another NDA. This new agreement, labeled a "privileged settlement communication," explicitly required Plaintiff to withdraw all complaints filed with the EEOC and other agencies, thereby attempting to obstruct lawful proceedings. The September 2, 2025 follow-up settlement proposal seeking a second NDA reinforces this exact pattern of retaliatory silence, monetary coercion, and obstruction of protected activity. Defendants attempted to silence Plaintiff using financial leverage rather than address the underlying violations..

73. On information and belief, Defendants were also aware of ongoing and dangerous safety conditions affecting school grounds, including incidents involving armed individuals across from the lower school playground. In a written communication to staff and parents, the Head of School acknowledged the presence of a disruptive neighbor using a pellet gun, the school's escalation to SWAT, and the frequent involvement of onsite security personnel to address these threats. This supports Plaintiff's claim that Defendants maintained a hazardous working environment while failing to implement adequate safety protocols or protections for contracted security personnel. (See exhibit V)

74. As a direct and proximate result of Defendants' retaliation and unlawful termination, Plaintiff was left without stable income and forced to vacate his apartment due to inability to pay rent. This loss of housing constitutes additional emotional distress and economic harm directly traceable to Defendants' misconduct and supports a claim for consequential damages. Plaintiff seeks damages for lost wages, loss of housing, relocation costs,

reputational harm, emotional distress, and punitive damages for Defendants' ongoing pattern of retaliation, coercion, and abuse of power.

## I. Contradictory Public Statements as Evidence of Pretext

75.. In June 2025, following Plaintiff's protected disclosures and the public circulation of a whistleblower podcast by a former parent, Saint Mark's Episcopal School publicly announced its intent to retain Praesidium, a third-party safety organization, to conduct a full audit of the school's policies and culture. This statement was disseminated via official school communication by Dr. Spencer Taintor (See Exhibit W). Despite asserting "nothing had changed," the school simultaneously declared the need for an external audit—an implicit admission of internal deficiencies. Yet, no audit ever occurred. This empty promise served only as a reputational shield while the school engaged in covert retaliatory conduct against Plaintiff. The contradiction between public messaging and actual conduct further supports Plaintiff's claims of retaliation, pretext, and institutional cover-up.

76. On or about June 20, 2025, Ginny Hines, Business Operations Manager for Saint Mark's, sent an internal email acknowledging that a parishioner was repeatedly using vulgar language on campus and directing it at Plaintiff. Despite this conduct being witnessed by multiple individuals, and occurring near children and classrooms, no disciplinary action was taken against the parishioner. Instead, the school merely documented the event, as indicated in Exhibit BB. This stands in stark contrast to how Plaintiff was treated for raising safety, harassment, and policy violations. Such selective enforcement and tolerance of others' misconduct, while retaliating against Plaintiff for protected activity, serves as evidence of pretext and discriminatory intent.

## J. Pattern of Retaliation Against Parents Who Question Misconduct

77. On or about June 9th 2025, former Saint Mark's parents, the Hennessy family, were expelled from the school after raising concerns about misconduct, safety, and harassment. In response, the school removed not only the parents but also their children, terminating the family's relationship with the school entirely. (See Exhibit AA.)

78. The expulsion letter explicitly states the removal was due to the family's ongoing questions and objections to school leadership and operations. This retaliation mirrors similar actions taken by the school against other whistleblowers and dissenters, including Plaintiff and parent Mr. Muñoz. The school consistently engages in patterns of suppression and intimidation to silence any inquiry into misconduct without any investigation.

## K. Saint Mark's Attempted Denial of Liability Through Counsel

79. On or about September 19, 2025, counsel for Defendant Saint Mark's Episcopal School issued a formal response to Plaintiff's Notice of Intent to Sue, via Fisher & Phillips LLP. The letter, signed by attorney Jennifer Carroll, denied all allegations raised by Plaintiff and disclaimed any employment relationship between Plaintiff and the school. Defendant St. Mark's asserted that Plaintiff "has never been an employee" and that all employment claims must be directed exclusively to Right2Protect, LLC. (See Exhibit EE).

80. Defendants' denial of employment responsibility stands in direct contradiction to the actual working conditions experienced by Plaintiff. Plaintiff was assigned exclusively to Saint Mark's Episcopal School campus, wore school-issued uniforms—including name badges created and distributed by Hellen Martinez of the school's business office bearing both the school name and the officer's name—and was subject to school-specific procedures and protocols. Plaintiff's shift assignments, duties, and coverage instructions came directly from Head of School Dr. Spencer Tainter and other Saint Mark's staff, who exercised day-to-day supervisory control.

81. Further undermining any claim of independent contractor status, Plaintiff and other Right2Protect officers received monetary bonuses whenever regular Saint Mark's employees were awarded them—demonstrating integration into the school's employee reward structure. Ultimately, Plaintiff's termination was carried out at the direct demand of Saint Mark's administration. These facts establish not only a joint employment relationship but also a clear pattern of functional control, retaliatory coordination, and misclassification. The evidence supports that Plaintiff was an employee under the law, wrongfully treated as a contractor to avoid legal accountability.

82. Plaintiff includes this letter as Exhibit EE and submits that its contents serve to confirm the strategy of denial, deflection, and corporate shielding employed by Defendants. The Court should disregard this denial and allow the case to proceed against all Defendants, including St. Mark's, as joint employers and co-conspirators in the acts alleged throughout this Complaint.

## L. Complete Institutional Silence and Blacklisting Following Protected Reports

83. Following the release of the Muñoz podcast—which echoed many of Plaintiff's protected disclosures regarding safety violations, retaliation, and institutional misconduct—Saint Mark's Episcopal School responded not with accountability, but with coordinated damage control and retaliatory silence. Rather than addressing the issues raised, the school leadership launched efforts to discredit the podcast, blacklisted those involved, and restricted internal communications related to the allegations.

84. Defendant Puyada (Right2Protect) was ordered to station himself at the school without pay as part of this damage control, while Plaintiff—who had previously raised nearly identical concerns—was marginalized, subjected to delayed or withheld wages, and ultimately terminated. Head of School Dr. Spencer Tainter directed Puyada to "cover the school for free" if Right2Protect wanted a chance at contract renewal.

85. In an apparent public relations move, Saint Mark's also brought in Praesidium, a third-party organization that specializes in abuse risk management, to consult on internal practices. This announcement was made shortly after the podcast aired, and served as a tacit acknowledgment of institutional failures—yet no corrective actions were taken regarding Plaintiff's reports. (See Exhibit W)

86. During this same period, several school employees were placed on administrative leave when new enhanced background and fingerprint checks were implemented. Previously, the school used a local or limited system that failed to flag key red flags in staff histories. After the podcast's exposure, however, Saint Mark's switched to a national fingerprinting and screening system and quietly removed individuals whose records raised concerns. This retroactive change further supports Plaintiff's claim that the school had been operating with deficient safety protocols—an issue he raised well before any public fallout.

87. Despite the sweeping institutional response following the podcast and Plaintiff's prior reports, no one from Saint Mark's or Right2Protect ever engaged directly with Plaintiff about the issues he raised—not the harassment, unsafe practices, retaliation, or misconduct. Multiple individuals explicitly told Plaintiff that they were instructed not to speak with him, and his name was deliberately omitted from all follow-up meetings, discussions, or acknowledgments—even as the school scrambled to implement risk reviews and background checks directly tied to the risks Plaintiff had identified. This targeted silencing functioned as a de facto gag order, isolating Plaintiff and sending a chilling message to others, thereby contributing to an increasingly hostile and retaliatory work environment designed to discredit and suppress further protected activity.

88. Instead, Right2Protect later issued an internal statement dismissing Plaintiff's protected disclosures as "spurious claims," asserting vaguely that "everything was handled"—even as institutional changes were quietly enacted in direct response to those same claims.

89. The school also spread internal narratives accusing Mr. Muñoz of lying, being crazy, inciting unrest, and threatening to "bring people up to riot the school," as one administrator reportedly phrased it. These baseless accusations were disseminated to shift blame, dissuade public sympathy, and protect the school's reputation. The individuals who agreed with the podcast or had similar experiences were systematically silenced—either expelled, left the school and or forced to sign NDAs, or intimidated into silence.

90. Saint Mark's actions reveal not only a pattern of retaliation and blacklisting, but also a refusal to acknowledge the truth of the underlying claims. At no point did any Defendant deny the core factual allegations made by Plaintiff or by others. Instead, they relied on blame-shifting, image repair, and institutional silence—refusing to investigate credible complaints and choosing instead to isolate those who spoke out.

**CLAIMS FOR RELIEF**

**Count I** – Sexual Harassment / Hostile Work Environment (Title VII) – Against Saint Mark's & R2P

**Count II** – Retaliation (Title VII & FCRA) – Against All Defendants
Defendants' stated reasons for terminating Plaintiff were pretextual. Defendant Puyada's admissions that he "had to do what the customer wants," his refusal to offer any reassignment, and counsel's September 2–3, 2025 threatening and disparaging emails demonstrate a continuing pattern of retaliation and coercion for Plaintiff's protected activity. (See ¶¶62–64, Exs. A–C.)

**Count III** – Negligence (Sex Offender Access) – Against Saint Mark's & R2P

**Count IV** – Negligence (Knife Incident) – Against Saint Mark's

**Count V** – Wrongful Termination & Retaliation – Against Saint Mark's & R2P

**Count VI** – Aiding and Abetting Discrimination & Retaliation (FCRA) – Against Individual Defendants

**Count VII** – Failure to Pay Overtime Wages (FLSA) – Against Saint Mark's & R2P

**Count VIII** – Constructive Discharge (Title VII & FCRA) – Against Saint Mark's & R2P

Plaintiff realleges and incorporates paragraphs 1–90 as though fully set forth herein. Defendants created and perpetuated working conditions so intolerable — including daily harassment, retaliation, coercion through NDAs, unsafe contractor access, and threats of termination — that a reasonable person in Plaintiff's position would have felt compelled to resign. These actions constitute constructive discharge in violation of Title VII and the Florida Civil Rights Act.

**Count IX** – Nonprofit Abuse and Financial Misconduct – Against Saint Mark's

Plaintiff realleges and incorporates paragraphs 1–90 as though fully set forth herein. Saint Mark's, while registered as a Florida Not for Profit Corporation, withheld public funds, falsified attendance records, delayed vendor payments to silence dissent, and used its status as leverage to conceal misconduct. These practices were abusive, retaliatory, and coercive in nature and contributed directly to Plaintiff's constructive discharge and retaliation.

**Count X** – Economic Damages & Forced Housing Displacement – Against All Defendants

Plaintiff realleges and incorporates paragraphs 1–90 as though fully set forth herein.

As a direct and proximate result of Defendants' unlawful conduct — including retaliation, termination, nonpayment of wages, constructive discharge, blacklisting, and reputational harm — Plaintiff suffered severe financial hardship, resulting in the involuntary loss of housing.

Defendants:

- Terminated Plaintiff without cause after months of retaliation and coercion;

- Delayed or denied payments for work already performed;

- Disrupted Plaintiff's employment and financial stability through blacklisting and coercive practices;

- Forced Plaintiff to surrender his apartment and living arrangements, resulting in the loss of access to basic housing.

Plaintiff seeks damages for:

- Lost wages and unpaid compensation;

- Loss of housing and associated relocation costs;

- Emotional distress and reputational harm; and

- Punitive damages for the malicious, retaliatory, and willful nature of Defendants' actions.

## COUNT VIII – CONSTRUCTIVE DISCHARGE (Title VII & FCRA)

Plaintiff realleges and incorporates paragraphs 1–90 as though fully set forth herein. Defendants created and perpetuated working conditions so intolerable — including daily harassment, retaliation, coercion through NDAs, unsafe contractor access, and threats of termination — that a reasonable person in Plaintiff's position would have felt compelled to resign. These actions constitute constructive discharge in violation of Title VII and the Florida Civil Rights Act.
As a direct and proximate result of the Defendants' unlawful conduct — including retaliation, termination, nonpayment of wages, constructive discharge, blacklisting, and reputational harm — Plaintiff suffered extreme financial hardship, resulting in the loss of his housing.
Defendants:

- Terminated Plaintiff without cause after months of retaliation and coercion;

- Delayed or denied payments for work performed;

- Disrupted Plaintiff's employment and financial stability through blacklisting and coercive conduct;

- Forced Plaintiff to surrender his apartment and living arrangements, losing access to basic housing.

Plaintiff seeks damages for lost wages, loss of housing, relocation costs, emotional distress, reputational harm, and punitive damages for the retaliatory and willful nature of Defendants' conduct.

**WHEREFORE**, Plaintiff seeks judgment against Defendants for constructive discharge, compensatory and punitive damages, lost wages, front pay, emotional distress, and such further relief as this Court deems just and proper.

## XI. DAMAGES

**As a direct result of Defendants' conduct, Plaintiff suffered:**

• Unpaid overtime wages for hours worked over 40 per week;

• Liquidated damages under the FLSA (equal to the amount of unpaid wages);

• Lost wages and overtime ($24/hr, 55+ hrs/week);

• Loss of future earnings and benefits;

• Emotional distress, humiliation, and mental anguish;

• Reputational harm and career damage.

**Plaintiff seeks compensatory and punitive damages in an amount to be determined at trial, but no less than $1,000,000 per Defendant, in addition to unpaid overtime wages, liquidated damages, and attorneys' fees under the FLSA.**

## XII. PRAYER FOR RELIEF

**WHEREFORE, Plaintiff respectfully requests the Court:**

A. Enter judgment for Plaintiff against Defendants;

B. Award compensatory and punitive damages of no less than $1,000,000 per Defendant;

C. Award back pay, front pay, and lost benefits;

D. Award attorney's fees and costs pursuant to 29 U.S.C. § 216(b) and 42 U.S.C. § 2000e-5(k);

E. Grant such other relief as the Court deems just and proper;

F. Declare the February 2025 NDA void and unenforceable due to duress, coercion, and violation of public policy;

G. Declare the September 2, 2025 settlement offer as evidence of continuing retaliation and suppression of protected rights;

H. Issue declaratory judgment that Defendants' conduct violated Plaintiff's rights under Title VII, FCRA, FLSA, and §1981.

**XIII. JURY DEMAND**

**Plaintiff demands a trial by jury on all issues so triable.**

**On September 30th, 2025**
**Respectfully submitted,**
**/s/ Ernest Rasheen Admiral**
**C/O 1201 N Federal Hwy Ste 4225**
**Fort Lauderdale, FL 33304**

**Table of Contents – Exhibits**

**ERNEST RASHEEN ADMIRAL -V- THE EPISCOPAL CHURCH OF SAINT MARK THE EVANGELIST, INC., et al., Case number:_____**

Exhibit A: EEOC Charge Letter (R2P) 510-2025-11512

Exhibit B: EEOC Tight To Sue (R2P)

Exhibit C: EEOC Charge letter (Saint Marks) 510-2025-11510

Exhibit D: EEOC Right To Sue (Saint Marks)

Exhibit E: Plaintiffs Pay Deposits from R2P (PPD payroll)

Exhibit F: Dr. Tainter's Mass Email to Discredit Change in security

Exhibit G: Schools involvement in Gay pride event

Exhibit H: Sex Offender Incident Texts with General Contractor

Exhibit I: Texts with Ginny Hines (uncomfortable at the school)

Exhibit J: Texts with Ginny Hines (sorry)

Exhibit K: Text Confirming Lunch Break Denial with (R2P)

Exhibit L: Saint Marks Sunbizz

Exhibit M: R2P forced NDA

Exhibit N: R2P Cease Communications demand

Exhibit O: Text with Mickey asking for info for backup

Exhibit P: Dr. Tainter's Mass Email to Discredit Podcast

Exhibit Q: Cease-and-Desist Letter to Parent Muñoz

Exhibit R: R2P's Lawyer emails

Exhibit S: R2P's Lawyer emails Privilege Settlement offers

Exhibit T: R2P Miguel D Puyada Licenses

Exhibit U: R2P text with plaintiff concerns

Exhibit V: Construction Safety Reports and Site Conditions

Exhibit W: Email from Taintor about bringing "Praesidium"

Exhibit X: R2P emails and text proof of misclassification

Exhibit Y: Magazines with Inappropriate Content Mailed to School

Exhibit Z: Text to Mickey march 2024 about magazines o

Exhibit AA: Expulsion Letter Sent to Hennessy Family for Asking Questions

Exhibit BB: Email from Ginny Hines about ongoing abuse from  church member

Exhibit CC:  Video Evidence: Teacher Morrill – HIV/PrEP Discussion

Exhibit DD: Video Evidence: Construction Worker with Knife – March 4, 2025 Incident

**Exhibit EE: Saint Mark's Attempted Denial of Liability Through Counsel**

**ERNEST RASHEEN ADMIRAL -V- THE EPISCOPAL CHURCH OF SAINT MARK THE EVANGELIST, INC., et al.,**